IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION

**Case Number: 21-CV-61179–RAR**

**FANNY B. MILLSTEIN, on behalf**
**of herself and all others similarly situated,**

      **Plaintiff,**

**v.**

**MARSHAL SEEMAN, NATIONAL**
**SENIOR INSURANCE, INC., a Florida**
**corporation d/b/a SEEMAN HOLTZ,**
**CENTURION INSURANCE SERVICES**
**GROUP, LLC, an Ohio limited liability**
**company, BRIAN J. SCHWARTZ, PARA**
**LONGEVITY HOLDINGS VI, LLC, a**
**Georgia limited liability company,**
**EMERALD ASSETS HOLDINGS, LLC, a**
**Georgia limited liability company,**
**PARA LONGEVITY 2014-5, LLC, a**
**Georgia limited liability company,**
**PARA LONGEVITY 2015-3, LLC, a**
**Georgia limited liability company,**
**PARA LONGEVITY 2015-5, LLC, a**
**Georgia limited liability company,**
**PARA LONGEVITY 2016-3, LLC, a**
**Georgia limited liability company,**
**PARA LONGEVITY 2016-5, LLC, a**
**Georgia limited liability company,**
**PARA LONGEVITY 2018-3, LLC, a**
**Georgia limited liability company,**
**PARA LONGEVITY 2018-5, LLC, a**
**Georgia limited liability company, PARA**
**LONGEVITY 2019-3, LLC, a Georgia**
**limited liability company, PARA**
**LONGEVITY 2019-5, LLC, a Georgia**
**limited liability company, PARA**
**LONGEVITY 2019-6, LLC, a Georgia**
**limited liability company,**
**EMERALD ASSETS 2018, LLC, a Georgia**
**limited liability company, INTEGRITY**

**ASSETS 2016, LLC,  a Georgia limited liability company, INTEGRITY ASSETS, LLC, a Georgia limited liability company, SH GLOBAL, LLC n/k/a PARA LONGEVITY V, LLC, a Georgia limited liability company,   ALTRAI GLOBAL, LLC a/k/a ALTRAI HOLDINGS, LLC, a Delaware limited liability company, VALENTINO GLOBAL HOLDINGS, LLC, a Delaware limited liability company, AMERITONIAN ENTERPRISES, LLC,  a Delaware limited liability company, SEEMAN-HOLTZ CONSULTING CORP., a Florida  corporation, CENTURION ISG HOLDINGS, LLC,   a Delaware limited liability company,  CENTURION ISG HOLDINGS II, LLC,   a Delaware limited liability company,  CENTURION ISG (EUROPE) LIMITED,  an entity formed under the laws of Ireland, CENTURION ISG SERVICES, LLC,   a Delaware limited liability company,   CENTURION ISG FINANCE GROUP, LLC,   a Delaware limited liability company,  CENTURION FUNDING SPV I, LLC,   a Delaware limited liability company,  CENTURION FUNDING SPV II, LLC,   a Delaware limited liability company, SEEMAN HOLTZ PROPERTY AND CASUALTY, LLC f/k/a SEEMAN HOLTZ PROPERTY CASUALTY, INC., a Delaware limited liability company, SHPC HOLDINGS I, LLC, a Delaware limited liability company,**

                **Defendants,**

**THE ESTATE OF ERIC CHARLES HOLTZ,**

                **Relief Defendant.**

_____/

## AMENDED CLASS ACTION COMPLAINT

Plaintiff Fanny B. Millstein, individually and behalf of all others similarly situated ( herein referred to as the "Plaintiff"), hereby sues Defendants, MARSHAL SEEMAN ("Mr. Seeman"), BRIAN J. SCHWARTZ ("Mr. Schwartz"), NATIONAL SENIOR INSURANCE, INC. d/b/a Seeman Holtz ("Seeman Holtz"), PARA LONGEVITY HOLDINGS VI, LLC ("PL Holdings"), EMERALD ASSETS HOLDINGS, LLC ("EA Holdings"), PARA LONGEVITY 2014-5, LLC ("PL 2014-5"), PARA LONGEVITY 2015-3, LLC ("PL 2015-3"), PARA LONGEVITY 2015-5, LLC ("PL 2015-5"), PARA LONGEVITY 2016-3, LLC ("PL 2016-3"), PARA LONGEVITY 2016-5, LLC ("PL 2016-5"), PARA LONGEVITY 2018-3, LLC ("PL 2018-3"), PARA LONGEVITY 2018-5, LLC ("PL 2018-5"), PARA LONGEVITY 2019-3, LLC ("PL 2019-3"), PARA LONGEVITY 2019-5, LLC ("PL 2019-5"), PARA LONGEVITY 2019-6, LLC ("PL 2019-6"), EMERALD ASSETS 2018, LLC ("EA-2018"), INTEGRITY ASSETS 2016, LLC ("IA-2016"),INTEGRITY ASSETS, LLC ("Integrity"), SH GLOBAL, LLC n/k/a PARA LONGEVITY V, LLC ("SH Global")  (PL 2014-5, PL 2015-3, PL 2015-5, PL 2016-3, PL 2016-5, PL 2018-3, PL 2018-5, PL 2019-3, PL 2019-5, PL 2019-6, EA-2018, IA-2016, Integrity, and SH Global are referred to herein collectively as the "PPEs" and individually as "PPE"), ALTRAI GLOBAL, LLC a/k/a ALTRAI HOLDINGS, LLC ("Altrai"), VALENTINO GLOBAL HOLDINGS, LLC ("Valentino"), AMERITONIAN ENTERPRISES, LLC ("Ameritonian"), SEEMAN-HOLTZ CONSULTING CORP. ("SH Consulting"), CENTURION INSURANCE SERVICES GROUP, LLC ("Centurion"), CENTURION ISG HOLDINGS, LLC ("CISG Holdings"),  CENTURION ISG HOLDINGS II, LLC ("CISG Holdings II"), CENTURION ISG (EUROPE) LIMITED ("CISG Europe"), CENTURION ISG SERVICES, LLC ("CISG Services"), CENTURION ISG FINANCE GROUP LLC ("CISG Finance"), CENTURION FUNDING SPV I, LLC ("CF SPV

I"),  CENTURION FUNDING SPV II, LLC ("CF SPV II") (Centurion, CISG Holdings, CISG Holdings II, CISG Europe, CISG Services, CISG Finance, CF SPVI, and CF SPV II are referred to herein collectively as the "Centurion Related Entities"), SEEMAN HOLTZ PROPERTY AND CASUALTY, LLC f/k/a SEEMAN HOLTZ PROPERTY CASUALTY, INC. ("SHPC"), and SHPC HOLDINGS I, LLC ("SHPC Holdings I"), and Relief Defendant THE ESTATE OF ERIC CHARLES HOLTZ and states as follows:

## Introduction

1.      This civil action seeks damages and injunctive relief to halt the scheme and racketeering enterprise operated and controlled by Mr. Seeman and his recently deceased business partner Eric Holtz ("Mr. Holtz"), who both founded and owned insurance agency Seeman Holtz..  Messrs. Seeman and Holtz were assisted in their scheme and racketeering enterprise (the "SH Enterprise") by Defendant Brian J. Schwartz, who primarily acted as the SH Enterprise's untitled chief financial officer.  As part of the SH Enterprise, Mr. Seeman, Mr. Holtz, and Mr. Schwartz ("SH&S") created and operated a myriad of corporate entities, certain of which are named as Defendants in this Amended Complaint and certain of which are no longer active corporate entities.  Generally, Mr. Seeman acted as the chief executive officer of the SH Enterprise, Mr. Holtz focused on sales and marketing, and Mr. Schwartz focused on financials and accounting.

2.      On or about July 12, 2021, the Florida Office of Financial Regulation (the "OFR") commenced an action against various defendants, including all the Defendants and Relief Defendant named herein, in Florida Circuit Court of the Fifteenth Judicial Circuit in and for Palm Beach County, Civil Division, styled *State of Florida, Office of Financial Regulation v. National Senior Insurance, Inc. d/b/a Seeman Holtz, et al.,* Case No. 502021CA008718XXXXMB (the

"OFR Action").  The OFR Action seeks injunctive relief and penalties against Defendants and Relief Defendant based on the fraudulent acts and omissions alleged to have been committed by the SH Enterprise, including many of those originally alleged by Plaintiff in the original Complaint filed in this action.  Although the OFR Action requested injunctive relief including, among other things, the entry of a temporary and permanent injunction to halt the SH Enterprise and the appointment of a Receiver, the OFR has not yet made any motions or taken any further legal actions to obtain that relief.

3.    Over the last decade, the SH Enterprise marketed and sold securities in the form of promissory notes purportedly collateralized by life insurance policies issued to third parties (the "Notes"). In promoting and selling these Notes to investors, primarily seniors, the SH Enterprise called them "longevity linked assets."  In other words, the SH Enterprise claimed to invest in life insurance policies which would pay to the holders of the Notes a substantial premium upon the death of the insured.  These are also sometimes referred to as "life settlements."  However, neither Seeman Holtz nor any of the Defendants associated with the SH Enterprise was registered to sell securities like the Notes.  Nor were their agents registered as financial advisors or properly licensed to sell the Notes. The Notes themselves were not properly registered as securities, nor did they qualify for exemption from registration under the applicable state securities statutes.  These facts alone entitle every investor to rescission of their investment as a matter of law.

4.    Attached as Exhibit A hereto is a certificate issued by the OFR's Custodian of Records testifying to the fact that the State of Florida has no record of any registration for each and every one of the PPEs that issued the Notes.  Such registration was required for Seeman Holtz and the Defendants associated with the SH Enterprise to sell the Notes under

the provisions of Chapter 517, Florida Statutes -- the Florida Securities & Investor Protection Act.

5.      The SH Enterprise fraudulently represented to investors in every PPE created in furtherance of the SH Enterprise that the underlying third-party insurance policy assets were held by a collateral agent to protect those assets.  In reality, no collateral agent held those assets and the SH Enterprise comingled all of the policies in the name of, and for the benefit of, SHPC and SHPC I.  This case arises from Plaintiff's and the members of the Class' investments in the Notes, which were at all times controlled by SH&S and the SH Enterprise, doing business as the Seeman Holtz "Family of Companies."

6.      Defendant Seeman Holtz markets itself as part of an integrated and intertwined "Family of Companies."  On the "Our Team" webpage of the www.seemanholtz.com website, Defendant Seeman Holtz states: "[o]ver many years, the Seeman Holtz Family of Companies has grown into a national trusted network, but it all started with two college roommates, decades earlier. Marshal Seeman and Eric Holtz co-founded everything our team is today.  Our proactive team focus is on comprehensive risk management and comprehensive financial advice."

7.      On the www.seemanholtz.com/our-team webpage, Defendant Seeman Holtz promotes its "Family of Companies" as including both Seeman Holtz and SHPC which is described as "one of the largest and fastest growing agencies in the nation, with over 50 acquisitions in just two years and plans to continue expansion."

8.      Plaintiff Fanny B. Millstein invested herself and with her husband, Gerald J. Millstein in two of the Notes.  As alleged herein, Plaintiff was promised that her and her husband's assets would be liquid and that they would be repaid upon maturity.  However, when the time came for repaying the Notes that the Plaintiff purchased, Seeman Holtz told

her that the firm was undergoing financial problems.  The effects have been devastating for Plaintiff.  At age 76, Fanny Millstein should not be forced to contemplate that her and her husband's life savings invested with Seeman Holtz have vanished.

9. Seeman Holtz is not a registered broker-dealer with the State of Florida, U.S. Securities and Exchange Commission or the Financial Industry Regulatory Authority. Messrs. Seeman and Holtz manage and control Seeman Holtz, are the managing members of the PPEs, and are the control persons under the securities law because they are responsible for the sale and registration of the Notes.  At all times material herein, Messrs. Seeman and Holtz owned, operated and controlled every aspect of the creation, sale and management of the Notes.

10. Using a network of unregistered financial advisors or dealers, the SH Enterprise sold the Notes to investors, including Plaintiff and other members of the Class, by telling those investors that the Notes were safe and secure and would be collateralized by a portfolio of life insurance policies which would provide safety of principal and substantial returns.

11. Accordingly, in connection with the sale of the Notes to Plaintiff and the members of the Class, SH&S managed and controlled (a) the selling dealer, Seeman Holtz; (b) the network of unregistered agents who acted as "financial advisors," as described by Seeman Holtz; and (c) the investments through their management and control of the Notes.

12. Defendants also made uniform material misrepresentations in connection with the sale of the Notes to Plaintiff and the members of the Class.  As discussed in more detail below, the offering documents for the Notes represented that the PPE would grant a security interest in all assets of the PPE, which would be managed by a collateral agent, Coral Gables Title and Escrow, Inc. ("CGTE" or the "Collateral Agent").

13.     Upon information and belief, these representations were materially false and misleading because (a) CGTE was administratively dissolved by the State of Florida in September 2015; and (b) the PPEs either have no collateral or are so undercollateralized to render meaningless the representations that the Notes were secured.

14.     Additionally, the PPEs paid Seeman Holtz a commission for selling the Notes, and similar notes to third parties, which it attempted to disguise as a "service fee" (even though there was no "service" for the "fee" other than selling the Notes).

15.     The Notes belonging to Plaintiff and the Class have matured, including specifically the following:

| Noteholder | Issuer | Matured |
|---|---|---|
| **Gerald J. Millstein and Fanny B. Millstein** | PL 2015-3 | Jan. 28, 2019 |
| **Fanny B. Millstein** | PL 2016-3 | Jan. 13, 2020 |

16.     The SH Enterprise consistently represented to investors that it could not redeem these Notes because of a lack of liquidity, claiming that the SH Enterprise needed additional time and was on the cusp of recapitalizing its affiliated property and casualty business in order to obtain the necessary liquidity for the redemptions. That has never happened.

17.     The OFR Action alleges the SH Enterprise raised more than $400 million in capital since 2011 through the sale of the Notes, and, on information and belief, there are currently more than $300 million in outstanding Notes held by more than 1,000 current investors, many holding more than one Note.

18.     Plaintiff has brought this action on behalf of herself and the members of the Class against Defendants and Relief Defendant to recover (1) all outstanding interest on the Notes; (2) the principal investments in the Notes that have matured; and/or (3) rescission of

the Notes. Moreover, Plaintiff seeks the appointment of a Receiver over the assets of all entity Defendants and other equitable relief, inclusive of an accounting of investor funds and other assets, including life settlements and insurance-related assets received or transferred since 2013, directly or indirectly from or to the Defendants, the Relief Defendant or from any individual, entity or party in any way participating in the SH Enterprise or in any way benefitting from the SH Enterprise.

## Parties

19.     Plaintiff Fanny B. Millstein is 76 years old and *sui juris*. Plaintiff Fanny B. Millstein is a citizen of the State of Florida residing in Broward County, Florida

20.     Mr. Holtz was an individual over the age of eighteen and *sui juris*. On information and belief, Mr. Holtz passed away on or about June 11, 2021 and was a citizen of the State of Florida residing in Broward County, Florida.

21.     Plaintiff brings this action against Relief Defendant Estate of Eric Charles Holtz ("Holtz Estate") and any successor in interest, any personal representative or administrator of the Holtz Estate for restitution, the return of ill-gotten gains, and unjust enrichment.

22.     Defendant Marshall Seeman ("Mr. Seeman" or "Seeman") is an individual over the age of eighteen and *sui juris*. Mr. Seeman is a citizen of the State of Florida. During the relevant time period, Mr. Seeman conducted business in Broward County, Florida.

23.     Defendant National Senior Insurance, Inc. d/b/a Seeman Holtz ("Seeman Holtz") is a Florida corporation with its principal place of business in Florida. During the relevant time period, Seeman Holtz conducted business in Broward County, Florida.

24.     Defendant Centurion Insurance Services Group, LLC ("Centurion") is an Ohio limited liability company with its principal place of business in Florida.

25.     Defendant Brian J. Schwartz ("Mr. Schwartz") is an individual over the age of eighteen and *sui juris.* Mr. Schwartz is a citizen of the State of Florida.  During the relevant time period, Mr. Schwartz conducted business in Broward County, Florida.

26.     Defendant Para Longevity Holdings VI, LLC ("PL Holdings") is a Georgia limited liability company.  Messrs. Seeman and Holtz are the sole members of PL Holdings. Because Messrs. Seeman and Holtz are citizens of the State of Florida and it is a Georgia company, PL Holdings is a citizen of the States of Georgia and Florida.

27.     Defendant Emerald Assets Holdings, LLC ("EA Holdings") is a Georgia limited liability company.  Messrs. Seeman and Holtz are the sole members of EA Holdings. Because Messrs. Seeman and Holtz are citizens of the State of Florida and it is a Georgia company, EA Holdings is a citizen of the States of Georgia and Florida

28.     Defendant Para Longevity 2014-5, LLC ("PL 2014-5") is a Georgia limited liability company whose sole member is PL Holdings.  Because the ultimate members of PL 2014-5 are Messrs. Seeman and Holtz and it is a Georgia company, PL 2014-5 is a citizen of Georgia and Florida.

29.     Defendant Para Longevity 2015-3, LLC ("PL 2015-3") is a Georgia limited liability company whose sole member is PL Holdings.  Because the ultimate members of PL 2015-3 are Messrs. Seeman and Holtz and it is a Georgia company, PL 2015-3 is a citizen of Georgia and Florida.

30.     Defendant Para Longevity 2015-5, LLC ("PL 2015-5") is a Georgia limited liability company whose sole member is PL Holdings.  Because the ultimate members of PL 2015-5 are Messrs. Seeman and Holtz and it is a Georgia company, PL 2015-5 is a citizen of Georgia and Florida.

31.     Defendant Para Longevity 2016-3, LLC ("PL 2016-3") is a Georgia limited liability company whose sole member is PL Holdings.  Because the ultimate members of PL 2016-3 are Messrs. Seeman and Holtz and it is a Georgia company, PL 2016-3 is a citizen of Georgia and Florida.

32.     Defendant Para Longevity 2016-5, LLC ("PL 2016-5") is a Georgia limited liability company whose sole member is PL Holdings.  Because the ultimate members of PL 2016-5 are Messrs. Seeman and Holtz and it is a Georgia company, PL 2016-5 is a citizen of Georgia and Florida.

33.     Defendant Para Longevity 2018-3, LLC ("PL 2018-3") is a Georgia limited liability company whose sole member is PL Holdings.  Because the ultimate members of PL 2018-3 are Messrs. Seeman and Holtz and it is a Georgia company, PL 2018-3 is a citizen of Georgia and Florida.

34.     Defendant Para Longevity 2018-5, LLC ("PL 2018-5") is a Georgia limited liability company whose sole member is PL Holdings.  Because the ultimate members of PL 2018-5 are Messrs. Seeman and Holtz and it is a Georgia company, PL 2018-5 is a citizen of Georgia and Florida.

35.     Defendant Para Longevity 2019-3, LLC ("PL 2019-3") is a Georgia limited liability company whose sole member is PL Holdings.  Because the ultimate members of PL 2019-3 are Messrs. Seeman and Holtz and it is a Georgia company, PL 2019-3 is a citizen of Georgia and Florida.

36.     Defendant Para Longevity 2019-5, LLC ("PL 2019-5") is a Georgia limited liability company whose sole member is PL Holdings.  Because the ultimate members of PL 2019-5 are Messrs. Seeman and Holtz and it is a Georgia company, PL 2019-5 is a citizen of

Georgia and Florida.

37.     Defendant Para Longevity 2019-6, LLC ("PL 2019-6") is a Georgia limited liability company whose sole member is PL Holdings.  Because the ultimate members of PL 2019-6 are Messrs. Seeman and Holtz and it is a Georgia company, PL 2019-6 is a citizen of Georgia and Florida.

38.     Defendant Emerald Assets 2018, LLC ("EA-2018") is a Georgia limited liability company whose sole member is EA Holdings.  Because the ultimate members of EA-2018 are Messrs. Seeman and Holtz and it is a Georgia company, EA-2018 is a citizen of Georgia and Florida.

39.     Defendant Integrity Assets 2016, LLC ("IA-2016") is a Georgia limited liability company whose sole member is Mr. Seeman.  Because the sole member of IA-2016 is Mr. Seeman and it is a Georgia company, IA-2016 is a citizen of Georgia and Florida.

40.     Defendant SH Global, LLC n/k/a Para Longevity V, LLC ("SH Global") is a Georgia limited liability company.  Because the ultimate members of SH Global are Messrs. Seeman and Holtz and it is a Georgia company, SH Global is a citizen of Georgia and Florida.

41.     Defendant Integrity Assets, LLC ("Integrity") is a Georgia limited liability company whose sole member is PL Holdings.  Because the ultimate members of Integrity are Messrs. Seeman and Holtz and it is a Georgia company, Integrity is a citizen of Georgia and Florida.

42.     Defendant Altrai Global, LLC a/k/a Altrai Holdings, LLC ("Altrai") is a Delaware limited liability company controlled by Mr. Holtz until his passing.  Mr. Holtz served as its sole member at all times material hereto.  On information and belief, Altrai owns one-third of Centurion and its related subsidiaries, described below.  Because Altrai was

operated from Florida by Mr. Holtz, Altrai is a citizen of Delaware and Florida.

43.     Defendant Valentino Global Holdings, LLC ("Valentino") is a Delaware limited liability company controlled by Mr. Seeman.  Mr. Seeman served as its sole member at all times material hereto.  On information and belief, Valentino owns one-third of Centurion and its related subsidiaries, described below.  Because Valentino was operated from Florida by Mr. Seeman, Valentino is a citizen of Delaware and Florida.

44.     Defendant Ameritonian Enterprises, LLC ("Ameritonian") is a Delaware limited liability company controlled by Mr. Schwartz.  Mr. Schwartz served as its sole member at all times material hereto.  On information and belief, Ameritonian owns one-third of Centurion and its related subsidiaries, described below.  Because Ameritonian was operated from Florida by Schwartz, Ameritonian is a citizen of Delaware and Florida.

45.     Defendant Seeman-Holtz Consulting Corp. ("SH Consulting") is a Florida corporation with its principal place of business in Florida.  During the relevant time period, SH Consulting conducted business in Broward County, Florida.

46.     Defendant Centurion ISG Holdings, LLC  ("CISG Holdings") is a Delaware limited liability company with its principal place of business in Florida.

47.     Defendant Centurion ISG Holdings II, LLC  ("CISG Holdings II") is a Delaware limited liability company with its principal place of business in Florida.

48.     Defendant Centurion ISG (Europe) Limited ("CISG Europe") was a corporate entity formed in Ireland with its principal place of business in Florida, and on information and belief was owned, directly or indirectly, and controlled by SH&S.

49.     Defendant Centurion ISG Services, LLC  ("CISG Services") is a Delaware limited liability company with its principal place of business in Florida.

50.     Defendant Centurion ISG Finance Group, LLC  ("CISG Finance") is a Delaware limited liability company with its principal place of business in Florida.

51.     Defendant Centurion Funding SPV I, LLC  ("CF SPV I") is a Delaware limited liability company with its principal place of business in Florida.

52.     Defendant Centurion Funding SPV II, LLC  ("CF SPV II") is a Delaware limited liability company with its principal place of business in Florida.

53.     Defendant Seeman Holtz Property and Casualty, LLC f/k/a Seeman Holtz Property and Casualty, Inc. ("SHPC") is a Delaware limited liability company with its principal place of business in Florida.

54.     Defendant SHPC Holdings I ("SHPC Holdings I") is a Delaware limited liability company with its principal place of business in Florida.

## Jurisdiction and Venue

55.     This Court has jurisdiction over this action pursuant to the Class Action Fairness Act of 2005 ("CAFA") (codified at 28 U.S.C. §§ 1332(d)(2)).  At least one member of the Class is a citizen of a different state than at least one defendant, there are more than one hundred members of the Class, and the aggregate amount in controversy exceeds five-million dollars ($5,000,000.00).

56.     This Court has personal jurisdiction over all Defendants because they are all Florida citizens and because they continuously and systematically operate, conduct, engage in, and carry on business in Florida.  The Court also has specific personal jurisdiction over the Defendants because the Defendants' wrongful conduct occurred in Florida and in this District, including the conduct by which they victimized Plaintiff.  Accordingly, the Defendants are subject to Florida's long arm jurisdiction under Fla. Stat. § 48.193.

14

57.     Venue is proper in this forum pursuant to 28 U.S.C. § 1391 because Defendants transact business, engaged in misconduct, and/or may be found in this District.  Venue is also proper here because at all times relevant hereto, Plaintiff resided in the Southern District of Florida, and a substantial portion of the practices complained of herein occurred in the Southern District of Florida.

58.     All conditions precedent to this action have occurred, been performed, or have been waived.

59.     Venue is proper in the Fort Lauderdale Division because it is the county in which: (1) the underlying controversy arose; (2) Defendants solicited and sold the Notes to Plaintiff; (3) the alleged wrongdoing occurred; and (4) Defendants conduct business.

<u>**General Allegations**</u>

**I.     <u>The Notes</u>**

60.     The SH Enterprise, utilizing materially uniform offering materials containing materially uniform misrepresentations and omissions, issued, solicited, offered, and sold Plaintiff and the members of the Class the Notes.  These included specifically the following promissory notes sold to Plaintiff:

| Noteholder | Issuer | Issue Date | Face Value | Maturity |
|---|---|---|---|---|
| **Gerald J. Millstein and Fanny B. Millstein** | PL 2015-3 | Jan. 28, 2016 | $125,000.00 | Jan. 28, 2019 |
| **Fanny B. Millstein** | PL 2016-3 | Jan. 13, 2017 | $101,037.10 | Jan. 13, 2020 |

61.     The material terms of the transaction documents for the Notes were nearly identical, aside from identifying different amounts invested, the duration of the Notes, and the dates of issuance and maturity.

## II.    The Sales of PPE Notes to Plaintiff

62.    In each instance, Seeman Holtz and/or the SH Enterprise, from offices in the State of Florida, solicited Plaintiff and the members of the Class to invest in the Notes on behalf of the PPEs and made these solicitations from within the State of Florida.

63.    Seeman Holtz and Messrs. Seeman and Holtz were "dealers" as defined under Fla. Stat. § 517.021(6)(a)(1) as persons engaged, either for all or part of her or his time, directly or indirectly, as a broker or principal in the business of offering, buying selling, or otherwise dealing or trading in securities issued by another person.

64.    Neither Seeman Holtz, Mr. Seeman nor Mr. Holtz were registered with the State of Florida as a dealer.

65.    Messrs. Seeman and Holtz are, and were, directors and/or officers of Seeman Holtz and PL Holdings, which is the Managing Member of certain of the PPEs, including those sold to Plaintiff.

66.    Based on their positions with PL Holdings, Messrs. Seeman and Holtz held the power to control the PPEs.

67.    Seeman Holtz contacted Plaintiff and the members of the Class to invest in the Notes, as indicated above.

68.    Seeman Holtz provided Plaintiff and the members of the Class with copies of the Private Placement Memorandums ("PPMs") for each Note they purchased, as well as a Note Purchase Agreement for each Note they purchased.

69.    Plaintiff and the members of the Class returned each of the completed Note Purchase Agreements to Seeman Holtz in Florida, and Seeman Holtz, in turn, transmitted the completed Note Purchase Agreements to the respective PPEs in Florida.

16

III.     **Misrepresentations Regarding the Collateral Agent in the PPEs' Notes**

70.     Each PPE represented in a materially identical fashion in each of the PPMs that the Notes would be secured by the assets of the respective PPE and that the PPE would grant a security interest in all of the assets of that PPE.

71.     According to the PPMs, the collateral agent, CGTE, which was owned and operated by Jeffrey Baxter, Esq., a licensed Florida attorney and agent of Chicago Title Insurance Company, would manage the security interest.

72.     However, in September 2015, the State of Florida administratively dissolved CGTE.  The last time CGTE filed an annual report with the State of Florida was in September 2014.  Thus, the PPE Notes sold after September 2015 failed to disclose that CGTE no longer existed.

73.     Pursuant to Fla. Stat. § 617.1421(3), "[a] corporation administratively dissolved continues its corporate existence but may not conduct any affairs except that necessary to wind up and liquidate its affairs . . . and adopt a plan of distribution of assets . . . ."

74.     Thus, when Defendants sold the Notes to Plaintiff after September 2015, they had no collateral agent to manage the collateral and ensure the Notes were secured, despite their representations to the contrary.

75.     When considering whether to invest in the Notes, a reasonable investor would consider the absence of a collateral agent important and a material misrepresentation in the offering documents used to sell the Notes.

76.     CGTE's status with the State of Florida continued as "Inactive."  Yet, on February 16, 2021, after over 5 years of inactivity and, in light of the apparent inability of Seeman Holtz to repay its debts, Jeffrey L. Baxter, Esq., applied to the State of Florida to reinstate CGTE as an

active Florida corporation.  On February 22, 2021, CGTE was reinstated as a Florida corporation but had to change its name to Coral Gables Collateral Agency, Inc., since its prior name was no longer available.

77.    The PPEs and Seeman Holtz have been unwilling or unable to provide Noteholders, including Plaintiff and the members of the Class, with an accounting of the collateral, the value of the collateral, or any other information regarding the value of the Notes.

## IV.    The Missing Collateral & Inability to Pay Interest or Repay Debts

78.    Upon information and belief, the Class member Noteholders have no secured interest in the collateral for the Notes, based upon the absence of any perfected finance statement from a review of UCC-1 filings in the State of Georgia and the State of Florida and admissions made by Defendants.

79.    On or about May 20, 2021, a public announcement was made that Seeman Holtz intended to hold a public sale of 100% of SHPC Holdings I's interests in SHPC, representing a majority of the outstanding interests in SHPC, and will be held on June 14, 2021. *See* https://www.rockcreekfa.com/seeman-holtz-property-casualty. Upon information and belief, such public sale took place in or about June 2021.

80.    Seeman Holtz is by its own admission facing extensive liquidity problems.  As alleged above, in 2020 and through the present, Seeman Holtz repeatedly claimed that it was about to close a large transaction that would recapitalize the company to provide it with the liquidity needed to redeem all of the Noteholders' requests.[1]  Seeman Holtz never explained ***why*** it would need to recapitalize or ***why*** any of the Seeman Holtz Family of Companies would need to

---

[1]    Mr. Holtz made the same types of excuses to the daughter of another aggrieved investor. *See Barbara Wohlwend v. Marshal Seeman, et al.*, Complaint, ¶¶ 48-50, Case No. 50-2021-CA-004978XXXX-MB-AH (Fla. 15th Cir. Apr. 16, 2021).

recapitalize to repay the debts of other business entities, like the PPEs, even if they were under

common control through Messrs. Seeman and Holtz.

81.     None of the Defendants ever discussed any post-maturity efforts that were required

to protect the assets of the respective PPEs.  For example, in the text of the PPM for the Para

Longevity 2018-5, the SH Enterprise caused the PPEs to represent:

> The Company anticipates that by maturity of the outstanding Notes sold
> in this offering, its portfolio of acquired assets will have been liquidated,
> or policies matured to the extent necessary to realize net proceeds
> sufficient to satisfy the Notes.  No assurance, however, can be given that
> the Company will be able to liquidate its assets in a timely fashion or on
> favorable terms in the time and amounts necessary to satisfy the Notes
> by maturity.  **If any assets of the Company have not been liquidated**
> **by maturity of the Notes and the Company therefore has**
> **insufficient assets to fully satisfy the Notes by their maturity date,**
> **such assets (plus reasonable reserves to fund such assets through**
> **liquidation as determined by the Managing Member) will be placed**
> **in a liquidating trust and the Company will continue its efforts to**
> **liquidate those assets in a timely manner and distribute net**
> **proceeds to satisfy the Notes**.

(Emphasis added.)

82.     Based on this language, any assets acquired by the PPEs that were not liquidated

by maturity should have been placed in a liquidating trust.  Neither the Collateral Agent, the PPEs,

Seeman Holtz, Mr. Seeman nor Mr. Holtz has presented any documentation regarding the status

of the liquidating trust, including the identity of any liquidating trustee, and there do not appear to

be any of either.  Instead, this representation, made in a materially uniform manner to all the

members of the Class, was false.

83.     Plaintiff's and the Class' Notes have matured and have been in default for over a

year.  In that time, the Collateral Agent has not commenced any action to secure any collateral,

and the PPEs have failed to liquidate their assets to repay their obligations.  As no liquidating agent

or Collateral Agent has been established, the Class member Noteholders have no way of learning

whether the investments hold any remaining value because it is unknown whether any collateral is still collectable or even exists.

84.     The absence of any information regarding the liquidating trust or the identity of any person with authority to direct the liquidation strongly suggests that there is no collateral, because, otherwise, the liquidating trustee would be engaging in an orderly distribution of the assets.

85.     Moreover, the above-quoted representation that the respective PPE anticipated liquidity of the assets held as collateral by maturity of the Notes could not have had any reasonable basis at the time it was made.  The PPEs are facing widespread defaults.  As for Plaintiff's Notes, after eighteen (18) and thirty (30) months in default, then at least some of the underlying collateral should have been liquidated or policies matured to have made partial redemptions to Plaintiff.

86.     Indeed, because Seeman Holtz cannot redeem the Notes unless it admittedly recapitalizes its property and casualty business, the collateral supposedly held by the PPEs was far more illiquid than represented in the PPMs.  Because of the long length of time without any redemption, Defendants' representation that the collateral would be liquid by maturity was false and misleading.

## V.     The "Hidden" Compensation and Undisclosed Commissions Paid to the <u>Representative</u>

87.     Seeman Holtz was paid a commission or other compensation in connection with each of the Notes that they sold to Plaintiff and the members of the Class.

88.     Specifically, Seeman Holtz was paid a "service fee" in connection with each Note that it sold. Despite being characterized as a service fee, however, Seeman Holtz was not required to provide any services in exchange for the fee other than offering and selling the Notes. Indeed, the only services provided appear to have been fielding emails and calls from aggrieved investors searching for where their funds actually were.

Ultimately, the amount of the purported service fee that was paid was determined based on the total value of the PPEs Notes that Seeman Holtz sold—including the total value of the Notes that Seeman Holtz sold to Plaintiff and the members of the Class.

89.     Messrs. Seeman and Holtz were personally involved in structuring, approving, and facilitating the byzantine manner in which the compensation was paid in connection with the sales of the Notes so that it was hidden behind a labyrinth of opaque, intra-company backchannels (thereby making it difficult to trace back to the PPEs).

**VI.**    **Schwartz, Centurion, and the SH Enterprise**

90.     In 2011, as part of the SH Enterprise, SH&S formed Defendant Centurion, an Ohio LLC, which was initially managed by Schwartz from offices in Ohio. Centurion was formed for use by the SH Enterprise to facilitate the purchase, holding and servicing of the life settlement portfolio that was acquired with investor funds,  As further described below, the Defendant PPEs later loaned funds directly to Centurion so Centurion and the subsequently formed Centurion Related Entities could purchase, hold and service the life settlement portfolio.  Schwartz served as president and CEO of Centurion.  Schwartz was the sole signatory on Centurion's bank accounts and on information and belief had signature authority on securities intermediary accounts holding life settlements.

91.     Centurion was nominally owned, operated and controlled by three limited liability companies, Defendants Valentino, Altrai and Ameritonian.  Each of these entities owned on-third of Centurion, with Seeman owning Valentino, Holtz owning Altria, and Schwartz owning Ameritonian.

92.     By 2013, the SH Enterprise had raised approximately $58 million in funds primarily from individual investors utilizing a growing group of SH Enterprise related entities to perform

tasks in furtherance of SH Enterprise's scheme.

93.     By 2013, funds raised by the individual PPEs were not being directly invested in life settlements by the respective PPEs.  Instead, investors' funds were transferred to Centurion and characterized as term loans from a PPE to Centurion with interest payments to occur annually, unless extended by the PPE, which subsequently became commonplace.  In certain loan records documenting these transactions, the face amount of the interest rate charged by the PPE to loan funds to Centurion was lower than the interest rate promised by the PPE to individual note investors, who were essentially funding these loans.

94.     While Schwartz was president and CEO of Centurion, Schwartz's salary was at times paid by Seeman Holtz.  On information and belief, Schwartz had several roles in the SH Enterprise including but not limited to: (1) operating Centurion without disclosing Seeman's and Holtz's roles to the public, (2) overseeing the deposit of incoming investor funds into PPE accounts, (3) overseeing the rapid transfer of funds thereafter from the PPE accounts to Centurion's account via wire transfers, (4) overseeing the rapid disbursement of funds back to earlier PPEs to repay earlier investors or to fund life settlement obligations (the latter occurring prior to Centurion obtaining a credit facility for premium payments in December 2018); and (5) accounting for the large number of back-to-back transactions each day. Schwartz has also performed work for specific PPEs by negotiating repayment timetables with investors whose interest payments were past due, without fully disclosing that the SH Enterprise was essentially insolvent and without fully disclosing that these future payments were dependent on the SH Enterprise's ability to raise additional new capital or receive asset transfers from SHPC Holdings I or SHPC, which were also facing insolvency issues.

95.     By 2015, Centurion increasingly relied on new investor funds received from PPEs

to meet its note obligations.  Centurion identified cumulative total borrowings from the PPEs growing to $135 million at FYE 2015; $157 million at FYE 2016; $193 million at FYE 2017; $250 million at FYE 2018; and $307 million at FYE 2019.  While certain revenue was recognized by Centurion during these periods by claiming the increased value of its life settlement portfolio as the portfolio matured, such revenue did not keep pace with PPE borrowings and did not solve cash needs to pay investor returns or life settlement premiums.  The growing Ponzi nature of this financing practice was apparent to SH&S as Centurion's reported net worth was $69 million at FYE 2015; $76 million at FYE 2016; $43 million at FYE 2017 (which included a "pledge" of shares by SH Holdings to Centurion, purportedly valued at $35 million, as an asset: absent this pledge, Centurion's net worth was $8 million): $128 million at FYE 2018 (also including the "pledge" of shares by SH Holdings to Centurion, then purportedly valued at $198 million, as an asset: absent this pledge, Centurion had a negative net worth of $70 million); and on information and belief, Centurion had a negative net worth of $195 million at FYE 2019.  The SH Enterprise's use of funds from new investors to pay old investors, rather than revenues from operations, also gave the appearance of profitability in order to gain new investors.  Such activities are hallmarks of a Ponzi scheme.

96.     The Defendants' investment program of PPE Notes operated through the SH Enterprise remains insolvent with liabilities far exceeding assets and the inability to pay the Notes' obligations as they become due.

97.     From at least February 2015, the SH Enterprise entities operated from common offices in Boca Raton, Florida; they shared common controlling ownership; they shred common officers; they share employees; and they often commingled their illicit funds, and used those funds to pay various expenses, including marketing and advertising expenses, rent expenses, phone and

computer expenses, legal expenses as well as salaries and bonuses to SH Enterprise entities' employees, agents and/or affiliates.

98.     SH&S received unjust enrichment from the commingled proceeds of the SH Enterprise's unlawful financing scheme in the form of salaries or other distributions through Seeman Holtz, Seeman Holtz Consulting, and other entities operated or controlled by SH&S.

99.     SH&S further misappropriated investor funds by not using investor funds for purposes described in the offering materials of the respective PPEs but instead using the proceeds to fund the SH Enterprise's operation and to make Ponzi-type payments to investors.  Such misappropriations were used to create a false, deceptive and misleading appearance of potential profitability of the investments and to avoid disclosure of the risks associated with the SH Enterprise's Note program.

100.    Between 2011 and the present, SH&S also organized, controlled, and operated the Centurion Related Entities, which are comprised of Defendants CISG Holdings, CISG Holdings II, CISG Europe, CISG Services, CISG Finance, CF SPV I, and CF SPV II.

101.    On information and belief, the Centurion Related Entities received, held and transferred SH Enterprise funds and other assets and performed various functions in furtherance of the SH Enterprise, including

a.     CF SPV I held certain of the life settlement policies purchased directly or indirectly with investor funds.

b.     CISG Holdings is a 50% owner of GEMS, LLC, an entity which owns 100% of CF SPV I, and therefore directly or indirectly held or partly controlled certain life settlement policies held by CF SPV I.

c.     CISG Europe was the original entity holding the beneficial ownership of the

life settlement policies and provided certain tax benefits to this structure. CISG Europe may continue to hold beneficial ownership of certain life settlement policies.

        d.     CF SPV II took the place of CISG Europe and also is a party to a credit facility provided by a lender in excess of $10 million, which now pays premiums for the life settlement portfolio.  On information and belief, CF SPV II may hold legal or beneficial interests or entitlement rights in 70 or more life settlement policies directly or indirectly owned by Centurion.

        e.     CISG Service was set up to be the servicer to Centurion insuring premiums were paid, verifying coverage, and performing other administrative activities.  Significant sums of investors' money moved through CISG Services bank accounts.

        f.     On information and belief, CISG Finance was create to pursue funds from individual investors similar to the activities associated with the use of PPEs.

## VII.   Class Action Allegations

102.    Pursuant to Federal Rules of Civil Procedure 23(a) and (b)(2) and/or (b)(3), Plaintiff bring this class action on behalf of herself and all others similarly situated.  The proposed class ("Class") is defined as follows:

> **All persons who purchased or held a beneficial interest in one or more of the Notes within the applicable limitations period. Excluded from the Class are Defendants, any entity in which any Defendant had a controlling interest, Defendants' officers, directors, legal representatives, successors, and assigns, and Defendants' immediate family members.**

103.    <u>Numerosity.</u>  There are over one hundred members of the Class, and the Class is so numerous that separate joinder of each member is impracticable.

104.    <u>Typicality.</u>  Plaintiff's claims are typical of the claims of the Class insofar as Plaintiff purchased and held a beneficial interest in the unregistered Notes that were collateralized

by the same or similar "longevity linked assets" and had the same or similar material terms, which were marketed and sold through the unregistered agents of the SH Enterprise, and Plaintiff were therefore harmed by the same wrongful activity as other Class members.

105.    <u>Adequacy</u>.      As investors in the Notes, Plaintiff will fairly and adequately protect the interests of all Class members, and do not have any claims that are antagonistic to those of the Class.  Plaintiff has retained competent counsel experienced in class action litigation, including securities litigation.  Plaintiff's counsel will fairly, adequately, and vigorously protect the interests of the Class.

106.    <u>Commonality.</u>  There are questions of law and fact that are common to the claims of the Plaintiff and the Class members, including, but not limited to, the following:

    a.  Whether Defendants violated Fla. Stat. § 517.07(1) in the recommendation and sale of the unregistered Notes issued by the PPEs to Plaintiff and the Class;

    b.  Whether Defendants violated Fla. Stat. § 517.12(1) by selling securities, *i.e.,* the Notes, to Plaintiff and the Class through agents who were not registered to sell securities pursuant to federal and state law;

    c.  Whether, in connection with the rendering of investment advice or in connection with the offer, sale, or purchase of the Notes, Defendants violated Fla. Stat. § 517.301 by misrepresenting to Plaintiff that there was collateral to secure repayment of the Notes, when there was no secured interest in collateral and no collateral agent existed;

    d.  Whether, in connection with the rendering of investment advice or in connection with the offer, sale, or purchase of the Notes, Defendants violated Fla. Stat. § 517.301 by, misrepresenting to Plaintiff that the Notes were safe investments that were consistent with an investment objective of safety of principal, when they were highly risky;

    e.  Whether the participants in the SH Enterprise breached their fiduciary duties owed to Plaintiff in the recommendation and sale of the Notes to Plaintiff;

    f.  Whether Defendants violated Florida RICO; and

    g.  Whether Plaintiff and the Class were damaged by the Defendants' misconduct.

**Fed. R. Civ. P. 23(b)(2)**

107.     Defendants have acted or refused to act on grounds that apply generally to the Class, so that final equitable, declaratory, or injunctive relief is appropriate with respect to the Class as a whole.

**Fed. R. Civ. P. 23(b)(3)**

      A.    <u>Predominance</u>

108.     The questions of law or fact common to the claims of the Plaintiff and the Class predominate over any questions of law or fact affecting only individual members of the Class.  All claims by Plaintiff and the unnamed Class members are based on the Defendants' fraudulent and unlawful conduct with regard to the sale of the Notes.

109.     Common issues predominate when, as here, liability can be determined on a Class-wide basis.

110.     As a result, when determining whether common questions predominate, courts focus on the liability issue, and if the liability issue is common to the class, as it is in this case, common questions will be held to predominate over individual questions.

111.     Because all claims by Plaintiff and the unnamed Class members are based on the same misconduct by the Defendants, the predominance requirement of Fed. R. Civ. P. 23(b)(3) is satisfied.

      B.    <u>Superiority</u>

112.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy. The burden and expense of managing many actions arising from Defendants' fraud and violations of law, and the potential for inconsistent results, counsel in favor of a class action — which presents far fewer management difficulties and provides the benefits of

27

a single adjudication, economy of scale, and comprehensive supervision by a single court.

## LEGAL CLAIMS

### Count I
### *Violation of Fla. Stat. § 517.07(1)*
### (against All Defendants and Relief Defendant)

113.    Plaintiff incorporates Paragraphs 1-112 as if stated fully herein.

114.    Section 517.07(1), Fla. Stat., provides that it is unlawful and a violation for any person to sell a security within the State of Florida unless the security is exempt under Fla. Stat. § 517.051, is sold in a transaction exempt under Fla. Stat. § 517.061, is a federally covered security, or is registered pursuant to Ch. 517, Fla. Stat.

115.    Section 517.211(1), Fla. Stat., provides that sales of securities in violation of Fla. Stat. § 517.07 may be rescinded by the purchaser and that "[e]ach person making the sale and every director, officer, partner, or agent of or for the seller, if the director, officer, partner, or agent has personally participated or aided in making the sale, is jointly and severally liable to the purchaser in an action for rescission, if the purchaser still owns the security." Fla. Stat. § 517.211.

116.    Each of the Notes is a security pursuant to Fla. Stat. § 517.021(22)(a).

117.    The Notes were not:

        a.    exempt from registration under Fla. Stat. § 517.051;

        b.    a federal covered security;

        c.    registered with the OFR; or

        d.    sold in a transaction exempt under Fla. Stat. § 517.061.

118.    The Defendant PPEs, as issuers, sold the Notes to Plaintiff and the members of the Class from offices within the State of Florida.

28

119.     The offering and sale of Notes to Plaintiff and the members of the Class by each Defendant PPE were not separate and distinct offerings but one integrated scheme of financing directed and controlled by SH&S as part of the SH Enterprise by, among other things, (a) soliciting Plaintiff and the members of the Class to purchase the Notes; (b) utilizing Seeman Holtz's offices, telephone numbers and email addresses to sell the Notes; and (c) receiving a commission or compensation for the sales.

120.     Each of the Defendants and Holtz, at the direction and control of SH&S, and through the SH Enterprise, personally participated or aided in the offering and sale of unregistered PPE Note securities within Florida or from Florida on at least 3,000 occasions, which securities and securities transactions were not exempt from registration nor involved a federally covered security.

121.     Because the Notes were not registered with the OFR, were not federally covered securities, were not exempt and were not sold in an exempt transaction, the sales of the Notes violated Fla. Stat. § 517.07 and may be rescinded under Fla. Stat. § 517.211(1) and (3).

WHEREFORE, Plaintiff, on behalf of herself and all similarly situated individuals and entities, demands judgment for rescission of the sale of the Notes against all Defendants and Relief Defendant jointly and severally; together with prejudgment interest, pursuant to Fla. Stat. § 517.211(3); reasonable attorneys' fees pursuant to Fla. Stat. § 517.211 (6); costs; post-judgment interest; and any and all further relief deemed just, equitable, and proper.

**Count II**
*Violation of Fla. Stat. § 517.12(1)*
**(against All Defendants and Relief Defendant)**

122.     Plaintiff incorporates Paragraphs 1-112 as if stated fully herein.

123.     Section 517.211(1), Fla. Stat., provides that sales of securities in violation of

Fla. Stat. § 517.12(1) may be rescinded by the purchaser and that "[e]ach person making the sale and every director, officer, partner, or agent of or for the seller, if the director, officer, partner, or agent has personally participated or aided in making the sale, is jointly and severally liable to the purchaser in an action for rescission, if the purchaser still owns the security."

124.    Section 517.12(1), Fla. Stat., provides that "[n]o dealer, associated person, or issuer of securities shall sell or offer for sale any securities in or from offices in this state, . . . by mail or otherwise, unless the person has been registered with the office [Florida Office of Financial Regulation] pursuant to the provisions of this section.

125.    Section 517.021(6)(a)(1) defines a "Dealer" as including:

> 1.    Any person, other than an associated person registered under this chapter, who engages, either for all or part of her or his time, directly or indirectly, as broker or principal in the business of offering, buying, selling, or otherwise dealing or trading in securities issued by another person.

> 2.    Any issuer who through persons directly compensated or controlled by the issuer engages, either for all or part of her or his time, directly or indirectly, in the business of offering or selling securities which are issued or are proposed to be issued by the issuer.

126.    Section 517.021(15), Fla. Stat., also provides that "[a]ny person who acts as a promoter for and on behalf of a corporation, trust, or unincorporated association or partnership of any kind to be formed shall be deemed an issuer," and Fla. Stat. § 517.021(19) defines "Promoter" as:

> a.    Any person who, acting alone or in conjunction with one or more other person, directly or indirectly takes the initiative of founding and organizing the business or enterprise of an issuer.

> b.    Any person who, in connection with the founding or organizing of the business or enterprise of an issuer, directly or indirectly receives in consideration of services or property, or

both services and property, 10 percent or more of any class of securities of the issuer or 10 percent or more of the proceeds from the sale of any class of securities. However, a person who receives such securities or proceeds either solely as underwriting commissions or solely in connection with property shall not be deemed a promoter if such person does not otherwise take part in founding and organizing the enterprise.

127.   Each of the Notes issued by the PPEs is a security pursuant to Fla. Stat. § 517.021(22)(a).

128.   The Notes sold to Plaintiff and the members of the Class were sold in or from offices in the State of Florida.

129.   Seeman Holtz was a dealer because it was engaged, either for all or part of its time, directly or indirectly, in brokering the sale of the Notes issued by the PPEs to the Plaintiff.

130.   Seeman Holtz was never registered with the OFR as a dealer.

131.   Each of the PPEs is an "issuer" of its respective Notes pursuant to Fla. Stat. § 517.021(15) ("'Issuer' means any person who proposes to issue, has issued, or shall hereafter issue any security").

132.   The PPEs were each a dealer because the PPEs each directly compensated Seeman Holtz through which the PPEs each engaged, either for all or part of its time, directly or indirectly, in the business of offering or selling securities where were issued or were proposed to be issued by the respective PPEs.

133.   The PPEs were also dealers because the PPEs each directly controlled Seeman Holtz. The PPEs through Messrs. Seeman and Holtz, possessed, directly or indirectly, the power to direct or cause the direction of the management or policies of Seeman Holtz, whether through the ownership of voting securities, by contract, or otherwise.

134.   SH&S were issuers of each of the respective PPEs because they acted as

promoters of the PPEs by (a) directly or indirectly taking the initiative of founding and organizing each of the PPEs; and/or (b) directly or indirectly, as the managing members of PL Holdings, receiving in consideration of services or property, or both services and property 10 percent or more of any class of securities of PPEs.

135.    As statutorily defined issuers, SH&S were the persons making, or personally participated or aided in making the sale, of the Notes to the Plaintiff and the members of the Class.

136.    Each of the Defendants and Holtz, at the direction and control of SH&S, and through the SH Enterprise, personally participated or aided in the offering and sale of unregistered PPE Note securities, including the Notes to the Plaintiff and the members of the Class within Florida or from Florida on at least 3,000 occasions, which securities and securities transactions were not exempt from registration nor involved a federally covered security.

137.    Because Seeman Holtz was not registered with the OFR, the sales of the Notes to the Plaintiff were made in violation of Fla. Stat. § 517.12(1), and therefore may be rescinded by the Plaintiff and the members of the Class pursuant to Fla. Stat. § 517.211(1).

WHEREFORE, Plaintiff, on behalf of herself and all similarly situated individuals and entities, demands judgment for rescission of the sale of the Notes against the PPEs, PL Holdings, Mr. Seeman, Mr. Holtz, and Seeman Holtz, jointly and severally; together with prejudgment interest, pursuant to Fla. Stat. § 517.211(3); reasonable attorneys' fees pursuant to Fla. Stat. § 517.211 (6); costs; post-judgment interest; and any and all further relief deemed just, equitable, and proper.

## Count III
### *Violation of Fla. Stat. § 517.301*
### (against All Defendants and Relief Defendant)

138.     Plaintiff incorporates Paragraphs 1-112 as if stated fully herein.

139.     It is a violation of Florida law to do any of the following in connection with the rendering of any investment advice or in connection with the offer, sale, or purchase of any investment or security:

> (1) Employ any device, scheme, or artifice to defraud;
>
> (2) Obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and
>
> (3) Engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon a person.

Fla. Stat. § 517.301(1)(a).

140.     The Notes issued by the PPEs are securities pursuant to Fla. Stat. § 517.021(22)(a).

141.     The Notes issued by the PPEs were each offered for sale and sold in or from offices in the State of Florida and within the State of Florida.

142.     In connection with the sale of the Notes to the Plaintiff and the members of the Class, each of the Defendants and Holtz, at the direction and control of SH&S, and through the SH Enterprise, personally participated or aided the PPEs and Seeman Holtz in obtaining money or property from the Plaintiff and members of the Class by means of untrue statements of material fact and the omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, including the following:

> a. There was collateral to secure repayment of the Notes, when there was no secured interest in collateral; and

       b.   Representing that the Notes were safe investments that were consistent with an investment objective of safety of principal, when they were highly risky.

143.    Additionally, the PPEs failed to disclose that they would pay commissions to Seeman Holtz for selling the Notes to the Plaintiff and members of the Class.

144.    Seeman Holtz was the entity that made the sale of the Notes to the Plaintiff and members of the Class by soliciting them to invest in those Notes.

WHEREFORE, Plaintiff, on behalf of herself and all similarly situated individuals and entities, demands judgment for rescission of the sale of the Notes against all Defendants and Relief Defendant, jointly and severally; together with prejudgment interest, pursuant to Fla. Stat. § 517.211(3); reasonable attorneys' fees pursuant to Fla. Stat. § 517.211 (6); costs; post-judgment interest; and any and all further relief deemed just, equitable, and proper.

<u>**Count IV**</u>
***Breach of Fiduciary Duty***
**(against Mr. Seeman, Mr. Schwartz, Seeman Holtz and Relief Defendant Estate of Eric Holtz)**

145.    Plaintiff incorporates Paragraphs 1-112 as if stated fully herein.

146.    Defendants Mr. Seeman, Mr. Schwartz, Seeman Holtz and Mr. Holtz owed a fiduciary duty to Plaintiff and the members of the Class.

147.    Plaintiff and the members of the Class reposed their trust and confidence in Mr. Seeman, Mr. Schwartz, Seeman Holtz and Mr. Holtz.

148.    Mr. Seeman, Mr. Schwartz, Seeman Holtz and Mr. Holtz undertook such trust and assumed a duty to advise, counsel, and protect Plaintiff and the members of the Class.

149.    Mr. Seeman, Mr. Schwartz, Seeman Holtz and Mr. Holtz breached their fiduciary duty to Plaintiff and the members of the Class.

150.    The conduct of Mr. Seeman, Mr. Schwartz, Seeman Holtz and Mr. Holtz caused Plaintiff and the members of the Class to incur damages.

WHEREFORE, Plaintiff, on behalf of herself and all similarly situated individuals and entities, demands compensatory damages against Mr. Seeman, Mr. Schwartz, Seeman Holtz and Relief Defendant Estate of Eric Charles Holtz reasonably believed to exceed $5,000,000, plus accrued and accruing interest, prejudgment interest pursuant to Fla. Stat. § 55.03, costs and for such further relief as is fair and just.

<u>**Count V**</u>
*Negligence*
**(against Mr. Seeman, Mr. Schwartz, Seeman Holtz and Relief Defendant Estate of Eric Holtz)**

151.    Plaintiff incorporates Paragraphs 1-112 as if stated fully herein.

152.    Mr. Seeman, Mr. Schwartz, Seeman Holtz and Mr. Holtz owed duties to Plaintiff and the members of the Class to recommend only suitable investments, and to deal with Plaintiff and the members of the Class in an honest and ethical manner.

153.    Mr. Seeman, Mr. Schwartz, Seeman Holtz and Mr. Holtz breached their duties to Plaintiff and the members of the Class.

154.    The breach of their duties by Mr. Seeman, Mr. Schwartz, Seeman Holtz, and Mr. Holtz was the direct and proximate cause of Plaintiff's and the Class members' damages.

WHEREFORE, Plaintiff, on behalf of herself and all similarly situated individuals and entities, demands negligence compensatory damages against Mr. Seeman, Mr. Schwartz, Seeman Holtz and Relief Defendant Estate of Eric Charles Holtz reasonably believed to exceed $5,000,000 plus accrued and accruing interest, prejudgment interest pursuant to Fla. Stat. § 55.03, costs and for such further relief as is fair and just.

## Count VI

### *VIOLATION OF FLORIDA'S CIVIL REMEDIES FOR CRIMINAL PRACTICES ACT, FLA. STAT.  §§ 772.103(1), (3)-(4), 772.104(1), 777.011, and 777.03(1)(a) ("RICO")*
### (against All Defendants and Relief Defendant)

155.    Plaintiff incorporates Paragraphs 1-112 as if fully stated herein.

156.    Each of Defendants and Holtz (collectively, the "RICO Defendants"), were associated in an enterprise and conspired, aided and abetted, and agreed to conduct and participate, directly and indirectly, in the conduct of the affairs of an enterprise (specifically the SH Enterprise) through a pattern of racketeering activity, in violation of Fla. Stat. §§ 772.103(1), (3)-(4), 772.104(1), 777.011, and 777.03(1)(a).

157.    The RICO Defendants engaged in a pattern of racketeering activity and engaged in more than two incidents of racketeering or racketeering conduct that have the same or similar intents, results, accomplices, victims, or methods of commission, and that are otherwise interrelated by distinguishing characteristics and are not isolated incidents.

### The Enterprise

158.    The SH Enterprise constituted an illegal scheme that was organized for the purpose of inducing investors to invest monies in the PPEs by means of untrue statements of material fact and the omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, including the following:

      a.   Representing that there was collateral to secure repayment of the Notes, when there was no secured interest in collateral;

      b.   Representing that the Notes were safe investments that were consistent with an investment objective of safety of principal, when they were highly risky; and

      c.   Failing to disclose that the PPEs would pay commissions to Seeman Holtz for selling the Notes to investors.

36

159.    Each of the RICO Defendants was associated with each other in fact through the SH Enterprise.

160.    Each of the RICO Defendants conducted or participated, directly or indirectly, in the Enterprise through a pattern of criminal activity, consisting of numerous and repeated uses of the interstate mails and wire communications, and acts of money laundering, all with the purpose of executing a scheme to defraud.

161.    Each of the PPEs was controlled (directly or indirectly) by Defendants Seeman and Holtz.

162.    The members of the SH Enterprise had a common purpose: to deceive investors in the Notes into believing that (1) there was collateral to secure repayment of the Notes, when there was no secured interest in collateral; (2)  the Notes were safe investments that were consistent with an investment objective of safety of principal, when they were highly risky; and (3) maximizing concealed commissions paid to Seeman Holtz for selling the Notes.

163.    The RICO Defendants agreed to engage in a pattern of racketeering activity using, among other things, the Seeman Holtz offices located in South Florida, to further the objectives of the Enterprise.

164.    The SH Enterprise functioned over a period of years and had a continuing, on-going structure, functioning as a continuous unit that maintained an ascertainable structure with established duties separate, distinct, and apart from the pattern of criminal activity described herein.

165.    The RICO Defendants conducted and participated, directly and indirectly, in the Enterprise through a pattern of criminal activity within the meaning of Florida Statute § 772.103(3), including violation of federal mail and wire fraud statutes, 18 U.S.C. §§ 1341 and

1343; and violation of the Florida Communications Fraud Act, Fla. Stat. § 817.034(4)(a). Acts of mail and wire fraud are subject to indictment or information as a criminal offense pursuant to 18 U.S.C. § 1961(1)(B), and are accordingly specifically delineated as "criminal activity" pursuant to Florida Statute § 772.102(1)(b). Violation of the Florida Communications Fraud Act is specifically delineated as "criminal activity" pursuant to Florida Statute § 772.102(1)(a)(22).

166.    These incidents of criminal activity had the same or similar intents, results, accomplices, participants, victims, or methods of commission, or otherwise were interrelated by distinguishing characteristics and were not isolated incidents.

167.    The RICO Defendants each directed, controlled, operated, and managed the Enterprise's affairs including, among other things, by agreeing to perform the following services, among others, which facilitated the activities of the SH Enterprise and its members:

a.    The RICO Defendants devised the scheme to defraud investors and divert their invested funds using the PPEs for the personal gain of the RICO Defendants;

b.    The RICO Defendants knowingly created, implemented, and managed the illicit financial structure in which undisclosed and concealed compensation was paid to Seeman Holtz from the sale of the Notes, the proceeds from the sale of the Notes of the various PPEs was improperly commingled, and the collateral for the Notes was never secured – contrary to their representations to investors.

c.    The RICO Defendants facilitated an intricate web of transfers among the various PPEs to disguise defaults of certain of the Notes and the fact that the collateral that was to secure those defaulted Notes was unsecured;

d.    Seeman and Holtz reviewed the contents of the Notes and Notes Purchase Agreements, were familiar with them, and understood they, their agents, and the PPEs they controlled had to abide by them. However, they knowingly caused the PPEs not to perform the obligations owed to Noteholders.

168.    The success of the SH Enterprise would not have been achieved but for the active, willing participation of Seeman Holtz and its office located in South Florida. The acts of Seeman Holtz in Florida provided the SH Enterprise with a platform through which the SH Enterprise could manipulate the funds it solicited from Plaintiff and the Class through withdrawal or transfer for the purposes of converting the funds for the unlawful uses of the SH Enterprise.

169.    Plaintiff has demonstrated the continuity of the Defendants' conduct over a fixed period of time spanning years.  Furthermore, the RICO Defendants continue to engage in these predicate acts and harm Class members on a daily basis, which establishes a threat of long-term racketeering activity and evidences the continuity of the RICO Defendants' open-ended pattern of racketeering activity.

170.    The success of the SH Enterprise's scheme made it possible for the RICO Defendants to enjoy substantial illegal financial benefits, through illicit payments and transaction fees.

171.    The RICO Defendants used and invested the income they received through their pattern of racketeering activity to operate their business which caused Plaintiff and the Class members to suffer direct damages.  The investment of the illicit proceeds obtained by the RICO Defendants through their fraudulent and illegal conduct enabled them to perpetuate the operation of the enterprise and to continue to defraud Plaintiff and the Class members.

**Defendants' Pattern of Racketeering Activity through the Enterprise**

172.    To effectuate the illegal objectives of the SH Enterprise and in furtherance of the scheme to defraud, the RICO Defendants committed numerous overt acts affecting hundreds of investors in violation of the federal mail and wire fraud statutes, as well as the Florida Communications Fraud Act.

173.    These predicate acts constitute a pattern of criminal racketeering activity because (1) at least two of the acts had the same or similar intents, results, accomplices, victims, or methods of commission or otherwise are interrelated by distinguishing characteristics and are not isolated incidents; (2) as described throughout this Complaint, this series of related acts extended over a substantial period of time; and (3) the last of such related acts occurred within 5 years after a prior incident of criminal activity.

174.    The RICO Defendants conducted the affairs of the Enterprise or participated in the affairs of the Enterprise, directly or indirectly, though a pattern of racketeering activity.

175.    At all relevant times, the RICO Defendants devised and carried out a scheme to conduct the affairs of the Enterprise to intentionally defraud investors in Florida and throughout the United States, including the Plaintiff and the Class, to enter into the Notes for which Seeman Holtz received undisclosed commissions and fees, and then entrusted the remaining funds (*i.e.*, Plaintiff's and the Class' principal investments) to the PPEs, which commingled those funds and failed to secure with collateral, contrary to what was represented to the investors.

176.    The RICO Defendants promoted the sale of the Notes through internet and newspaper advertising paid for with proceeds of the scheme, which directed potential investors to contact Seeman Holtz using a toll-free telephone number, as well as communications through the internet, email, U.S. mail and other interstate delivery services, and wire transfers, and interstate emails, telephone calls, and wire transfers were used in furtherance of the scheme.

177.    Specifically, the RICO Defendants directed, approved, or ratified the use of internet and newspaper advertising, the internet, interstate email, telephone calls, and other communications to intentionally defraud investors in Florida and other states, including Plaintiff and the Class, to invest in the Notes that were extraordinarily risky, were unregistered, and were

not secured by collateral as represented in the RICO Defendants' advertising and other communications.

178.    As part of this scheme, by the use of newspapers, interstate emails, internet, and telephone calls, the Enterprise targeted and solicited unsophisticated individual investors to invest in the Notes. The RICO Defendants' use of commercials, newspapers, internet, interstate emails, and telephone calls intentionally created the false impression that the Notes were safe, low-risk investments by representing there was collateral to secure repayment of the Notes, when there was no secured interest in collateral, and therefore the investors' principal was not secured. Furthermore, the RICO Defendants' use of commercials, newspapers, internet, interstate emails, and telephone calls intentionally omitted that the PPEs would pay substantial commissions to Seeman Holtz for selling the Notes to investors.

179.    Upon the sale of a Note to an investor, the SH Enterprise furthered the scheme by using interstate wires to pay the undisclosed commissions to Seeman Holtz and make purported interest distributions to investors, via wires and electronic bank withdrawals.

180.    The RICO Defendants continued to make false and misleading statements and material omissions concerning the Notes via U.S. mail and interstate electronic mail communications to conceal from investors, including Plaintiff, that the Notes were not properly secured by collateral and/or in default.

181.    The RICO Defendants' conduct constitutes "fraud by wire" within the meaning of 18 U.S.C. § 1343 and "fraud by mail" within the meaning of 18 U.S.C. § 1341 which are "racketeering activit[ies]" as defined by 18 U.S.C. 1961(1). Their repeated and continuous use of such conduct to participate in the affairs of the Enterprise constitutions a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).

## Violations of the Florida RICO Statute

182.     The RICO Defendants willfully and knowingly conducted or participated, directly or indirectly, in the SH Enterprise through a pattern of criminal activity within the meaning of Florida Statute § 772.103(3).

183.     For the purpose of executing the scheme to defraud, the RICO Defendants conducted and participated in the SH Enterprise's affairs through a pattern of racketeering activity consisting of numerous and repeated uses of the interstate mails and wire communications, in violation of the Florida Communications Fraud Act, Fla. Stat. § 817.034(4)(a).

184.     Because the scheme was not disclosed, and as a result of the RICO Defendants' conduct and participation in the racketeering activity in violation of section 772.103 as alleged herein, Plaintiff and the Class could take no action to avoid the misuse and embezzlement of their funds.

185.     The RICO Defendants' scheme to defraud, misuse, and embezzle funds caused Plaintiff and the Class to suffer damages in the form of the loss of their investments, which were transferred to Defendants or the entities they controlled as a direct and proximate result of the criminal activity described herein.

186.     The RICO Defendants are jointly and severally liable for their own acts and those of the other participants in the SH Enterprise as well as the entities controlled by members of the SH Enterprise. As a result of the RICO Defendants' acts, Plaintiff and the Class invested tens of millions of dollars in the SH Enterprise's scheme.

WHEREFORE, Plaintiff, on behalf of herself and all similarly situated individuals and entities, demands judgment against the RICO Defendants together with prejudgment interest, attorneys' fees, costs, post-judgment interest, and any and all further relief deemed just,

equitable, and proper.

### Count VII
*Conspiracy to Violate*
*Florida's Civil Racketeer Influenced and Corrupt Organizations Act*
**(against All Defendants and Relief Defendant)**

187.    Plaintiff incorporates paragraphs 1-112 above as if fully set forth herein.

188.    At all relevant times, each of the RICO Defendants was a principal, agent, alter ego, joint venturer, partner, or affiliate of the other Defendants, and in doing the acts alleged herein, was acting within the course and scope of that principal, agent, alter ego, joint venture, partnership, or affiliate relationship. Each RICO Defendant had actual or constructive knowledge of the acts of each of the other Defendants, and ratified, approved, joined in, acquiesced, or authorized the wrongful acts of the co-Defendant, and/or retained the benefits of said wrongful acts.

189.    The RICO Defendants, and each of them, aided and abetted, encouraged, and rendered substantial assistance to the other Defendants, and others, in perpetrating their unlawful, unfair or fraudulent scheme on Plaintiff and the Class. In taking action, as alleged herein, to aid, abet, encourage, and substantially assist the commissions of the wrongful acts and other wrongdoings complained of, each of the RICO Defendants acted with an awareness of its primary wrongdoing and realized that its conduct would substantially assist the accomplishment of the wrongful conduct, wrongful goals, and wrongdoing herein alleged.

190.    The RICO Defendants agreed with each other, beginning no later than September 2015, to violate Florida Civil RICO as alleged herein by accomplishing a common and unlawful plan, namely, to engage in a pattern of racketeering activity.

191.    The objects of the conspiracy included, without limitation, the misappropriation of funds from Plaintiff and the Class by means of a scheme to defraud. By these misappropriations, the RICO Defendants gained personal benefits, obtained funds directly from the conversion of

43

Plaintiff's and the Class' funds for their own use, and fraudulently profited through their fraudulent scheme.

192.    Each of the RICO Defendants knowingly and willfully joined in and became a member of the conspiracy.

193.    At the time each of the RICO Defendants joined the conspiracy, they did so with the specific intent either to personally engage in at least two incidents of racketeering conduct, or they specifically intended to otherwise participate in the affairs of the SH Enterprise with the knowledge and intent that other members of the conspiracy would engage in at least two incidents of racketeering conduct, as part of a "pattern of racketeering conduct."

194.    The RICO Defendants' agreement to join a conspiracy to engage in a pattern of racketeering activity can be reasonably inferred from their close professional relationship, their mutual financial gain resulting from their pattern of racketeering activity, their use of bank accounts and property, their use of the Seeman Holtz offices in Florida, and the dependency of the fraudulent acts of each on the fraudulent acts of the others. The RICO Defendants' agreement was manifested by the number and similarity of the racketeering offenses committed by them as discussed herein.

195.    By reason of the RICO Defendants' conspiracy to violate Florida Civil RICO in violation of Fla. Stat. § 772.103, Plaintiff and the Class suffered injury in that they invested in the Notes, investments which they would not have made but for the RICO Defendants' scheme to defraud. Specifically, Plaintiff and the Class invested over $5 million in the Notes. The RICO Defendants' misuse and embezzlement of funds caused Plaintiff and the Class to suffer damages in the form of the loss of their investments as a direct and proximate result of the RICO Defendants' commission of the foregoing predicate acts.

196.     The RICO Defendants' RICO violations were the actual cause of Plaintiff's and the Class' damages, which would not have occurred without the RICO Defendants' conduct. In addition, Defendants' acts and violations were the direct, natural, and proximate cause of damage to Plaintiff and the Class, including but not limited to, the loss of Plaintiff's and the Class' funds.

197.     The RICO Defendants are jointly and severally liable for the acts of one another and for the acts of the members of the SH Enterprise, as their acts were pursuant to a single conspiracy.

WHEREFORE, Plaintiff, on behalf of herself and all similarly situated individuals and entities, demands judgment against the Defendants and Relief Defendant together with prejudgment interest, attorneys' fees, costs, post-judgment interest, and any and all further relief deemed just, equitable, and proper.

**Count VIII**
*Violation of 18 U.S.C. § 1962(a), (c)-(d)*
**(against All Defendants and Relief Defendant )**

198.     Plaintiffs incorporate Paragraphs 1-112 as if fully stated herein.

199.     Defendants Messrs. Seeman and Schwartz are each a "person" within the meaning of 18 U.S.C. § 1962(a), (c)-(d) as the term is defined by 18 U.S.C. § 1961(3).

200.     Each of the other named RICO Defendants are limited liability companies or corporate entities capable of holding a legal interest in property and are thus "persons" within the meaning of 18 U.S.C. § 1962(a), (c)-(d) as the term is defined by 18 U.S.C. § 1961(3).

201.     The SH Enterprise was comprised of separate individuals and entities associated with each other by shared personal and/or one or more contracts or agreements for the purpose of originating, underwriting, marketing, selling, and servicing the Notes to Plaintiffs and the Class, who reside in Florida and numerous other states.

202.    The SH Enterprise constituted a single association-in-fact enterprise within the meaning of 18 U.S.C. §1962(a), (c)-(d), as the term is defined in 18 U.S.C. §1961(4).

203.    The SH Enterprise had an existence separate and apart from the illegal activity alleged herein.

204.    Each of the RICO Defendants had a distinct role in the SH Enterprise.

205.    Defendant Seeman was the Chief Executive Officer and an agent of each of the PPEs and personally participated or aided in making each of the sales of the Notes based on the above-described misrepresentations and/or material omissions of facts to investors.  In addition, Seeman was personally involved in structuring, approving, and facilitating the byzantine manner in which compensation was paid to Seeman Holtz in connection with the sales of the Notes.

206.    Mr. Holtz was the Executive Vice President and Secretary and an agent of each of the PL Entities and personally participated or aided in making each of the sales of the Notes as evidenced by, among other things, the fact that he was personally involved in structuring, approving, and facilitating the byzantine manner in which the compensation was paid to Seeman Holtz in connection with the sales of the Notes.

207.    Defendant Schwartz was president and CEO of Centurion, and Mr. Schwartz's salary was at times paid by Seeman Holtz.  Mr. Schwartz had several roles in the financing and transfers of funds among the various participants in the SH Enterprise, and in receiving and distributing funds to investors in the Notes, without fully disclosing that the SH Enterprise was essentially insolvent and without fully disclosing that these future payments were dependent on the SH Enterprise's ability to raise additional new capital or receive asset transfers from SHPC Holdings I or SHPC, which were also facing insolvency issues.

208.    Defendant Seeman Holtz acted as the selling dealer of the Notes and facilitated

the SH Enterprise's fraudulent scheme by soliciting, marketing, advertising, and having its employees and agents recommend the Notes to investors and potential investors. Defendant Seeman Holtz was also the ultimate recipient of the commissions, fees, and other financial benefits of the fraudulent scheme.

209. Defendant PPEs, SHPC, and SHPC I were under common control through Messrs. Seeman and Holtz, and commingled the funds received from investors in the Notes in a byzantine manner in which the compensation was paid in connection with the sales of the Notes so that it was hidden behind a labyrinth of opaque, inter-company backchannels.

210. Defendants Altrai, Valentino, Ameritonian are shell companies created in furtherance of the SH Enterprise, and paid Messrs. Seeman, Holtz, and Schwartz the benefits of the fraudulent scheme.

211. Defendant Centurion and Centurion Related Entities received, held, and transferred SH Enterprise funds and other assets and performed various functions in furtherance of the SH Enterprise described herein.

212. The SH Enterprise was engaged in interstate commerce and used instrumentalities of interstate commerce in its daily business activities.

213. Specifically, the RICO Defendants maintained offices in Florida and Georgia, and used personnel in these offices to originate, underwrite, fund, market, sell, and service the Notes. The Notes were marketed and sold to individuals in Florida and numerous other states via the extensive use of interstate emails, telephone calls, wire transfers, and bank withdrawals processed electronically.

214. Communications between the RICO Defendants and Plaintiff and the members of the Class were conducted through the internet, interstate email, telephone calls, wire transfers,

and other interstate wire communications. Specifically, Defendants used the internet, interstate emails, and telephone calls to originate, underwrite, market, and sell the Notes via electronic interstate transfers.

215.    The RICO Defendants conducted the affairs of the SH Enterprise or participated in the affairs of the SH Enterprise, directly or indirectly, though a pattern of racketeering activity (wire fraud and mail fraud) in violation of 18 U.S.C. § 1962(a), (c)-(d).

216.    At all relevant times, the RICO Defendants devised and carried out a scheme to conduct the affairs of the SH Enterprise to intentionally defraud investors in Florida and throughout the United States, including the Plaintiff and the members of the Class, to enter into the Notes Purchase Agreements and the Notes, for which Seeman Holtz received upfront, concealed commissions and fees, and then entrusted the remaining funds (*i.e.*, Plaintiff's and the Class' principal investments) to the PPEs. In turn, the various PPEs improperly commingled the proceeds from the sale of the Notes between and among the various PPEs and other RICO Defendants. The collateral in life insurance policies for the respective Notes was never secured – contrary to Defendants' representations to the Plaintiff and the members of the Class.

217.    The SH Enterprise functioned over a period of years and had a continuing, on-going structure, functioning as a continuous unit.

218.    As alleged herein, the RICO Defendants promoted the sale of the Notes through internet advertising, which directed potential investors to contact Seeman Holtz using a toll-free telephone number, as well as other communications through the internet, email, U.S. mail, and other interstate delivery services, and wire transfers, and therefore, it was reasonably foreseeable that interstate emails, telephone calls, the U.S. mail, and wire transfers would be used in furtherance of the scheme, and, in fact, interstate emails, telephone calls, the U.S. mail, and wire

transfers were used in furtherance of the scheme.

219.     Specifically, the SH Enterprise directed, approved, or ratified the use of advertising, the internet, interstate email, telephone calls, and other communications to intentionally defraud investors in Florida and other states, including Plaintiff and the members of the Class, to enter into the Notes Purchase Agreements and Notes that were extraordinarily risky, were unregistered, and were not properly secured by collateral as represented in the SH Enterprise's advertising and other communications.

220.     As part of this scheme, by the use of the internet, interstate emails, and telephone calls, the SH Enterprise targeted and solicited unsophisticated individual investors to invest in the Notes. The RICO Defendants' use of newspapers, internet, interstate emails, and telephone calls intentionally created the false impression that the Notes were safe, low-risk investments by representing there was collateral to secure repayment of the Notes, when there was no secured interest in collateral, and therefore the investors' principal was not safely secured.  Furthermore, the RICO Defendants' use of newspapers, internet, interstate emails, and telephone calls intentionally omitted that the PPEs would pay substantial commissions  to Seeman Holtz for selling the Notes to investors.

221.     Upon the sale of a Note to an investor, the SH Enterprise furthered the scheme by using interstate wires to pay the undisclosed commissions to Seeman Holtz and make purported interest distributions to investors, via wires and electronic bank withdrawals.

222.     The RICO Defendants continued to make false and misleading statements and material omissions concerning the Notes via U.S. mail and interstate email communications to conceal from investors, including Plaintiff and members of the Class, that Notes were not properly secured by collateral and/or in default.

49

223.   The RICO Defendants' conduct constitutes "fraud by wire" within the meaning of 18 U.S.C. § 1343 and "fraud by mail" within the meaning of 18 U.S.C. § 1341 which are "racketeering activit[ies]" as defined by 18 U.S.C. 1961(1). Their repeated and continuous use of such conduct to participate in the affairs of the SH Enterprise constitutes a pattern of racketeering activity in violation of 18 U.S.C. § 1962(a), (c)-(d).

224.   As a direct and proximate cause of the RICO Defendants' violation of 18 U.S.C. § 1962(a) (c)-(d) , Plaintiff and members of the Class suffered, and continue to suffer, substantial losses of their savings and property as Plaintiff and members of the Class are no longer receiving monthly interest payments (or receive greatly diminished payments) and cannot and likely will not receive the repayment of their principal as promised by the SH Enterprise, and they will continue to suffer such financial and economic injury for the foreseeable future.

WHEREFORE, Plaintiff, on behalf of herself and all similarly situated individuals and entities, demands judgment against the Defendants and Relief Defendant together with prejudgment interest, attorneys' fees, costs, post-judgment interest, and any and all further relief deemed just, equitable, and proper.

## Count IX
### *Equitable Action for Appointment of Receiver, for Accounting and for Disgorgement of Ill-Gotten Gains, Unjust Enrichment, and Constructive Trust*
**(against All Defendants and Relief Defendant)**

225.   Plaintiff incorporates paragraphs 1-112 above as if fully set forth herein.

226.   Plaintiff and the members of the Class provided funds to Defendants in connection with the purchase of securities issued by or through the Defendants and the SH Enterprise.

227.   Defendants and Mr. Holtz provided investment advice, acted as unregistered securities issuers and dealers, sold unregistered securities, and engaged in securities fraud in connection with these sales, in violation of chapter 517, Florida statutes.

228.    The funds provided by Plaintiff and the members of the Class were received by the Defendants in connection to violations of chapter 517, Florida Statutes.

229.    Defendants and Relief Defendant, directly or indirectly, received ill-gotten gains, misappropriations or unjust enrichment from certain Defendants in connection to the receipt of these investors' funds and in violations of chapter 517, Florida Statutes.

230.    The exact amount of funds received and the exact amount of funds that may have been returned by the Defendants and Relief Defendant are unknown to the Plaintiff.

231.    It would be inequitable for such amounts to remain with the Defendants and Relief Defendant as ill-gotten gains, misappropriations, and unjust enrichments, rather than being repaid to Plaintiff and members of the Class, the rightful owners of these funds.

232.    As a direct consequence of their fraudulent acts and/or their breach of fiduciary duties, Defendants and Relief Defendant have been unjustly enriched by funds rightfully belonging Plaintiff and members of the Class, and Plaintiff and members of the Class equitably hold a constructive trust as to those unjust enrichments.

WHEREFORE, Plaintiff, on behalf of herself and all similarly situated individuals and entities, requests an order of the court (1) imposing a constructive trust over the ill-gotten gains, misappropriations and/or unjust enrichments received by Defendants and Relief Defendant since 2013 and (2) appointing a Receiver over the assets of all entity Defendants (a) who, subject to final Court approval, may direct the Defendants and Relief Defendant to account for all funds received directly or indirectly from the Defendants or agents of the Defendants, since 2013, and to identify the basis for such receipts and (b) who, subject to final Court approval, may require Defendants and Relief Defendant to disgorge all ill-gotten gains, misappropriations, and unjust enrichment received directly or indirectly from the Defendants or agents of the Defendants since 2013.

**Jury Trial Demanded**

Plaintiff hereby demands trial by jury for all issues so triable.

Respectfully submitted,

Dated: <u>August 24, 2021</u>

SALLAH ASTARITA & COX, LLC
*Co-Counsel for Plaintiff*
One Boca Place
2255 Glades Rd., Ste. 300E
Boca Raton, FL 33431
Tel.: (561) 989-9080
Fax: (561) 989-9020

<u>/s/Joshua A. Katz, Esq.</u>
**James D. Sallah, Esq.**
Fla. Bar No. 0092584
Email: jds@sallahlaw.com
**Joshua A Katz, Esq.**
Fla. Bar No. 0848301
Email: jak@sallahlaw.com

MENZER & HILL, P.A.
*Co-Counsel for Plaintiff*
7280 W. Palmetto Park Rd., Ste. 103
Boca Raton, FL 33433
Tel.: 888-923-9223
Fax: 561-880-8449

**Gary S. Menzer, Esq.**
Fla. Bar No. 60386
Email: gmenzer@menzerhill.com
**Michael S. Hill, Esq.**
Fla. Bar No. 37068
Email: mhill@menzerhill.com

SILVER LAW GROUP
*Co-Counsel for Plaintiff*
11780 W. Sample Road
Coral Springs, FL 33065
Tel.: (954) 755-4799
Fax: (954) 755-4684

**Scott L. Silver, Esq.**
Fla. bar No. 095631
Email: ssilver@silverlaw.com
**Ryan A. Schwamm, Esq.**
Fla. Bar No. 1019116
Email: rschwamm@silverlaw.com
**Peter M. Spett, Esq., Of Counsel**
Fla. Bar No. 0088840
Email: pspett@silverlaw.com

BUCKNER + MILES
*Co-Counsel for Plaintiff*
2020 Salzedo Street, Ste. 302
Coral Gables, Florida 33134
Tel.: (305) 964-8003
Fax: (786) 523-0585

**David M. Buckner, Esq.**
Fla. Bar No. 60550
Email: david@bucknermiles.com
**Brett E. von Borke, Esq.**
Fla. Bar No. 0044802
Email: vonborke@bucknermiles.com

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on August 24, 2021, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  I also certify that the foregoing document is being served this day on all counsel of record via transmission of Notices of Electronic Filing generated by CM/ECF.

By:   s/ David M. Buckner
David M. Buckner, Esq.
Fla. Bar: 60550
david@bucknermiles.com

## **SERVICE LIST**

Scott Alan Orth, Esq.
Law Offices of Scott Alan Orth, P.A.
3860 Sheridan Street, Suite A
Hollywood, FL 33021
scott@orthlawoffice.com
service@orthlawoffice.com (primary)
eserviceSAO@gmail.com (secondary)

*Counsel for Defendants*